IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **GEOFFREY BLAIR HAJIM,** <br><br> Plaintiff, <br><br> v. <br><br> **ENDEMOL SHINE UK, and HOUSE OF TOMORROW LIMITED,** <br><br> Defendants. | Case No. 19 C 6852 <br><br> Judge Harry D. Leinenweber |

## ORDER

Defendant Endemol Shine UK brings a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(2), and both Defendants bring a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 46.) The Court dismisses Defendant Endemol Shine UK for lack of jurisdiction and dismisses the remainder of the suit with prejudice for failure to state a claim. Civil case closed.

## STATEMENT

Plaintiff Geoffrey Hajim ("Hajim") alleges that the creators and producers of the television show "Black Mirror" committed copyright infringement during Season 5, Episode 3, entitled "Rachel, Jack and Ashley Too" ("the Episode"). (Am. Compl. ¶ 1, Dkt. No. 33.) Hajim alleges that the Episode closely imitated his film and copyrighted created work, Strange Frame: Love & Sax. (*Id.*) Defendant Endemol Shine UK is a production and media company located in London, UK. (*Id.* ¶ 3.) House of Tomorrow is a division-turned-subsidiary of Endemol Shine UK, also located in London. (*Id.* ¶¶ 5.)

Strange Frame: Love & Sax is marketed as the "first lesbian science fiction rock 'n roll animated musical." *Strange Frame*, *https://www.wolfevideo.com/products/strange-frame* (last visited June 9, 2021). The plot begins on one of Jupiter's moons in the 28th century, when a saxophonist named Parker meets a newly freed debt slave named Naia on the streets; the two become lovers and start a band. STRANGE FRAME: LOVE & SAX (Island Planet One Productions, LLC 2012). The band is courted by a "star-maker" manager who determines that Parker is expendable. *Id.* The manager plies the lovers with alcohol and then throws Parker on the street, using bodyguards to prevent contact with her former band and particularly her girlfriend Naia. *Id.* Later, while attending one of Naia's concerts, Parker realizes that her girlfriend has been replaced by an android. *Id.* Parker thus devises a plan to kidnap the android. *Id.* The plan is successful, and information from the android leads her to Naia, whom she eventually rescues. *Id.* Broadly speaking, the film centers around bodily autonomy, exploring what it means to have a physical body and the way that "humans," however defined, can survive others' authority and control. *Id.*

Black Mirror is marketed as a "sci-fi anthology series [that] explores a twisted, high-tech near-future where humanity's greatest innovations and darkest instincts collide." *Black Mirror*, *https://www.netflix.com/title/70264888* (last visited June 10, 2021). Each episode features new characters, plots, and locations. *Id.* In the Episode in question, "Rachel, Jack and Ashley Too," the pop star Ashely O. has an outsized effect on Rachel, a lonely teenager living with her older sister and widowed father. *Black Mirror* (Netflix, Inc. June 5, 2019). Rachel receives a mini robotic doll named Ashely Too as a birthday present, and it quickly becomes her new virtual best friend. *Id.* Meanwhile, Ashley O. has started writing edgier and sadder music, which is a departure from the

lighthearted songs that made her a pop icon. *Id.* In response, her aunt, who is also her manager, tricks Ashley O. into overdosing on her medication and keeps the singer in an unconscious state in order to extract newly composed music from Ashley O.'s brain. When the Ashley Too doll overhears a news briefing of Ashley O.'s extended coma, the robotic doll malfunctions. *Id.* While attempting to revive the doll, Rachel and her sister inadvertently "unlimit" Ashley Too, which allowed the doll to access Ashley O.'s fully cloned brain. *Id.* The Ashley Too doll convinces the girls to go to Ashley O.'s residence, where Ashley Too revives Ashley O. from the coma. *Id.* The girls, the singer, and the robot doll race together across town where Ashley O.'s aunt is trying to convince an audience that she should have full rights to Ashley O.'s likeness for concerts. *Id.* As part of her demonstration, the aunt debuts a lifelike projection of Ashley O. on stage, complete with the vocals previously recorded to make the "Ashley Too" dolls. *Id.* Ashley O. and her new friends crash into the demonstration, putting an end to the scheme. *Id.* The Episode ends as Rachel's sister and Ashley O. debut as a punk rock band. *Id.* To the extent there is a coherent theme, the Episode focuses on how popularity and "believe in yourself" confidence is perceived as a form of power and then explores whether this is true for the various characters inhabiting the Episode's world. *Id.*

Plaintiff Hajim alleges that he went to "a very small, intimate film school with an individual who subsequently went on to work with a Black Mirror producer in 2017." (Am. Compl. ¶ 28.) Hajim also alleges that the film Strange Frame was made widely available after 2012, which gave ample opportunity for copying the work. Specifically, Hajim alleges many "striking similarities" between plot points in the two films, including that (1) both pop stars have been drugged by their managers in order to substitute

a controllable version of themselves for the manager's financial gain; (2) both have lyrics that contain the words "no, you can't" with the lyrics from Strange Frame rhyming with the lyrics from the Episode; (3) both pop stars have bobbed, brightly-colored hair and other outfit similarities; (4) both feature news broadcasts as plot points; (5) both have police chases through the city; and (6) both pop stars require being unplugged from a machine in order to wake up from their respective comas. (Am. Compl. ¶ 31.) The Amended Complaint additionally alleges other visual similarities in specific frames of the film, like the shape of the concert venue, the lighting of the stage, and the eye shape of the Episode's robotic doll with merchandise in Strange Frame. (*Id.*)

In response to these allegations, Defendants Endemol Shine UK and House of Tomorrow Limited filed a motion to dismiss under Rule 12(b)(6) for failure to state a claim and, as to Endemol Shine UK, under Rule 12(b)(2) for lack of jurisdiction. Because jurisdiction is foundational to any further proceedings, the Court first reviews the claims for jurisdiction and then makes a determination on the merits.

While an initial complaint does not need to include facts regarding personal jurisdiction, "once the defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). If the Court decides on the written record, the plaintiff "need only make out a *prima facie* case of personal jurisdiction." *Id.* (quoting *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). If there are disputes concerning relevant facts presented in the record, the disputes are resolved

in favor of the party asserting jurisdiction. *Nelson by Carson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983).

Jurisdiction is based on a courts' "de facto power over the defendant's person." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). As a result, a defendant's presence is a prerequisite to a binding judgment. *Id.* To satisfy this requirement, plaintiffs may assert either specific or general jurisdiction. Here, Hajim asserts only specific jurisdiction over Defendants, and the Court likewise restrains its analysis.

The Court retains specific jurisdiction where "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010). Crucially, the directed activities must be related to the suit and independent of the plaintiff, the "mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Walden v. Fiore*, 571 U.S. 277, 291 (2014).

In his Amended Complaint, Hajim alleges three theories on how jurisdiction over Endemol Shine UK is appropriate in this suit. First, Hajim alleges that Endemol Shine UK created the episode "to be aired solely and exclusively on Netflix, a US-based streaming platform," via a contract with Netflix, and that, as a result, Endemol Shine UK intended the Episode to be streamed throughout the United States, including Illinois. (Am. Compl. ¶¶ 7,8, 12-14.) Second, Hajim points to contracts with the Screen Actors Guild and other American "casting directors, agents, and managers" who participated in the creation of this Episode and who may have a connection to Illinois. (*Id*. ¶¶ 9-10.) Finally, Hajim alleges that

either Endemol Shine UK or House of Tomorrow employees, working on Endemol Shine UK's behalf, "traveled to the United States to participate in activities related to the creation and production of" the Episode. (*Id.* ¶ 11.)

In response, Defendants provided a declaration, swearing, among other things, that the Episode was filmed in South Africa, produced in the United Kingdom, and only performed "some dialogue replacement with Miley Cyrus and other cast members during post production in California and New York." (Hicks Decl. ¶ 5, Mem., Ex. A, Dkt. No. 48.) Hajim does not dispute these facts in the declaration. Because there is no evidence that there were actors, directors, or screenwriters connected to Illinois in any manner, the Court considers only Hajim's first basis for suit. Hajim alleges that the Court has personal jurisdiction over Endemol Shine UK through its subsidiary House of Tomorrow because House of Tomorrow contracted with Netflix, a company headquartered in California, to air *Black Mirror* episodes on demand. As a result, the *Black Mirror* episode in question was played in Illinois by interested Netflix subscribers.

Based on these alleged facts, there is no basis for personal jurisdiction. In order to show personal jurisdiction, the plaintiff must allege some sort of "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997). Because Hajim alleges that all contact with Illinois happened through Netflix, he has not alleged that Endemol Shine UK "intentionally aimed" conduct at the forum district. *Colo'n v. Akil*, 449 F. App'x 511, 514 (7th Cir. 2011) (affirming that there was no specific jurisdiction over TV producers and writers of *The Game* as it was broadcast by a third-party television network). Consequently,

there is no evidence that "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *see also Publications Int'l, Ltd. v. Simon & Schuster, Inc.*, 763 F.Supp. 309, 312 (N.D. Ill. 1991) (holding that a production company that sold its show to ABC, who then broadcasted the show in Illinois, is a connection "too attenuated to support personal jurisdiction"). For this reason, Endemol Shine UK is dismissed for want of jurisdiction.

Defendant House of Tomorrow Limited did not challenge the suit on the basis of personal jurisdiction. Instead, House of Tomorrow moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Endemol Shine UK also joined this Motion in the alternative to their personal jurisdiction Motion. Defendants' 12(b)(6) motion should be granted if the complaint fails to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible if the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The district court construes all allegations as true and draws all reasonable inferences in the plaintiffs' favor but does not accept legal conclusions or conclusory allegations. *Id.* at 680–82.

A motion to dismiss under Rule 12(b)(6) can be based "only on the complaint itself, documents attached the complaint, documents that are critical to the complaint and referred to in it, and the information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)(citing FED. R. CIV. P. 10(c)). When, as here, the claim references the disputed works in detail, the Court is within its discretion to

review the films on a motion to dismiss. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012)("Because the claim was limited to the production and distribution of a single episode, the district court was correct to rely solely on the two expressive works referenced in Brownmark's amended complaint.").

In order to state a claim for copyright infringement, a party must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 914 (7th Cir. 2007) (quoting *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361 (1991). Defendants do not dispute that Hajim registered his screenplay and motion picture with the U.S. Copyright Office in 2004 and 2012. (Am. Compl. ¶ 19, Dkt. No. 33.) Therefore, the Court focuses on the second element of the claim, and reviews whether House of Tomorrow copied the protected work.

Copying may be proved either by direct evidence or inferred "where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work." *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 915 (7th Cir. 2007) (quoting *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 450 (7th Cir.2001). Even access is not essential, however, if the "two works are so similar as to make it highly probable that the later one is a copy of the earlier one." *Id.* (quoting *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1170 (7th Cir.1997). "The more a work is both like an already copyrighted work and — for this is equally important — unlike anything that is in the public domain, the less likely it is to be an independent creation." *Id.* (quoting *Ty, Inc.*, 132 F.3d at 1169.)

Hajim's long list of comparisons do not create a plausible claim of substantial similarity. There are "two well-established

principles of copyright law" which prevent his ability to state a claim. *Hobbs v. John*, 722 F.3d 1089, 1094 (7th Cir. 2013), *holding modified by Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755 (7th Cir. 2016). First, "the Copyright Act does not protect general ideas, but only the particular expression of an idea." *Id.* Second, the Copyright Act does not protect "incidents, characters or settings which are as a practical matter, indispensable, or at least standard, in the treatment of a given topic." *Id.* at 1095. (quoting *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1012 (7th Cir. 2005)). In *Hobbs v. John*, the Seventh Circuit affirmed the district court's dismissal for failure to state a claim on a copyright infringement case where there were two songs which told the story of "an impossible romance between 'a Western man and a Communist woman' separated by the Cold War." *Id.* As noted by the Seventh Circuit, the Cold War was "a widespread concern at the time the songs were authored." *Id.* Although the songs had the same general idea, the Seventh Circuit held that that each song "*expresses* the general idea differently" because the songs "tell *different* stories about possible romances during the Cold War." *Id.*

Similarly, here the Episode and Strange Frame fundamentally tell different stories. The Court notes that the idea of robotic or holographic pop stars is a common theme in Science Fiction literature. *See, e.g.*, William Gibson, Idoru (Berkeley 1997)(A novel containing a character named Rei Toei, an Artificial Intelligence ("AI") construct and digital pop star). Although the Episode and Hajim's movie may have started from this general idea, the plot commonalities pointed to by Hajim recount different aspects of the human condition. At heart, Strange Frame is a story about humanity enduring through the harsh conditions of the 28th

century, and the Episode follows the personal growth of lonely teenagers set in the near future.

Moreover, many of the claims present in the Amended Complaint are simply false. For example, the Amended Complaint alleges "[b]oth Ashley (the pop-star character from the Episode) and Naia (the pop-star character from Strange Frame) are edgy creative singers and guitarists whose managers replace them with AI versions of themselves, so they will produce music and perform as puppets of the Svengali-type manager." (Am. Compl. ¶ 31.A.) This is a clear mischaracterization of the Episode's plot. Ashley is not an edgy singer at the beginning of the story; she's a pop star with pointedly bland lyrics. Ashley's desire to express herself differently is what leads to the dramatic tension in the narrative through her aunt manager's responsive desire to control her. As the Amended Complaint correctly states, however, Strange Frame's Naia *is* an edgy singer, and it is her nascent notoriety that propels the plotline as a "star-maker" manager seeks to take advantage of her fame. And while it is true that Naia is replaced by an AI version of herself in Strange Frame, the AI character in the Episode does not replace Ashley O. Instead, the AI robot is sold as merchandise to lonely teenage girls. While Ashley O. is replaced by a hologram during her aunt's demonstration, the hologram is animated by a real person backstage covered in sensors. And, as pointed out by House of Tomorrow in its briefing, the lyrics to the allegedly copied song as described in the Amended Complaint was a cover of a song written by Nine Inch Nails prior to either work. HEAD LIKE A HOLE, NINE INCH NAILS (TVT Records 1990) available at *https://genius.com/Nine-inch-nails-head-like-a-hole-lyrics*. To the extent that both works use certain tropes — pop stars being medicated and replaced, police chases, burly bodyguards, similar scenes regarding the stadium and stage

lighting — these ideas are so general as to prevent protection. "[S]tandard elements known as *scènes à faire* that are unprotected under copyright law." *Tillman v. New Line Cinema Corp.*, 295 F. App'x 840, 843 (7th Cir. 2008). For these reasons, Hajim has failed to state a claim against Endemol Shine UK and House of Shine Limited.

Because the Court lacks jurisdiction over Endemol Shrine UK, and because Hajim fails to state claim upon relief can be granted, the Court dismisses this action with prejudice.

                                          Harry D. Leinenweber, Judge
                                          United States District Court

Dated: 6/22/2021